## THE SAN ANGELO.

## CAPILLA et al. v. PACIFIC–ATLANTIC S. S. CO. et al.

### WRIGHT v. SAME.
### Nos. 6627, 6628.

Circuit Court of Appeals, Third Circuit.
Sept. 30, 1938.

Abraham Freedman, of Philadelphia, Pa., for appellants.

Rawle & Henderson, of Philadelphia, Pa., Proctors (Thomas Mount, of Philadelphia, Pa., and Joseph W. Henderson, of Philadelphia, Pa., of counsel), for appellees.

Before DAVIS and BIGGS, Circuit Judges, and MARIS, District Judge.

DAVIS, Circuit Judge.

These cases involve the same issues of fact and law and were consolidated by agreement of counsel in both the District Court and in this court. All the appellants were members of the crew of the S. S. San Angelo on a voyage from Seattle, Washington, to Philadelphia, Pennsylvania. A rider, attached to the shipping articles, provided that: "In the event vessel lays up in any Atlantic Coast port for any reason for which the crew is not responsible, crew to be paid up to the time the vessel lays up, and to be paid one hundred and twenty-five dollars ($125.00) additional in cash in lieu of transportation, subsistence, lodging and wages back to Pacific Coast".

For reasons which will be discussed later, the S. S. San Angelo was "laid up" at the wharf in Philadelphia, and the crew was paid wages up to that time, but was not paid the $125 additional specified in the shipping articles. In order to collect this extra $125, the appellants filed libels in admiralty against the appellees.

The District Court dismissed the libels and an appeal was taken to this court.

This being a suit in admiralty, the proceedings in this court amount to a trial de novo, and we must render an independent judgment upon the evidence. The Ariadne, 80 U.S. 475, 13 Wall. 475, 20 L. Ed. 542; Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 53 S. Ct. 103, 77 L.Ed. 240. However, as we stated in the case of Doll v. Scott Paper Company, 3 Cir., 91 F.2d 860, 862, "it is a well-established rule 'that the decision of the trial court in admiralty cases upon controverted questions of fact will not be dis-

turbed by the appellate court unless clearly against the weight of the evidence.'"

The case involves a "controverted question of fact", which is whether or not the appellants were responsible for the fact that the S. S. San Angelo was laid up in Philadelphia.

The trial judge, after listening to the testimony and observing the witnesses on the stand, in his opinion (not reported) filed August 8, 1937, said:

"The 'San Angelo' docked at 7:45 A. M. Saturday, October 31, 1936. At that time, there was a strike which had resulted in tying up shipping on the entire West Coast, and which had been in progress for sometime. Everyone on the ship rather expected that they would find labor troubles either existing or about to break out in Philadelphia, and there was general uncertainty.

"At eight o'clock, there were apparently two gangs of stevedores, sufficient in number to unload the cargo, on the pier head. They did not go aboard the ship at any time, and must have left rather early, because the Stevedoring Company made no charge for their time. There was sufficient steam up to operate the winches, but when the stevedores failed to appear on deck, the chief engineer ordered the deck engineer to cut it off from the deck until they were ready to use it. Steam was kept up in the boilers and could have been brought to the deck by merely turning on a valve.

"The crew remained on the ship during Saturday morning. As to whether or not they refused to work, the testimony is conflicting and unsatisfactory. In all probability, the delegates appointed by the crew and the crew themselves were uncertain both in their own minds and in what they said as to whether they were going to furnish power for unloading the cargo, in view of the strike on the West Coast and a few of the Ship Cleaners Union pickets on the dock in front of the 'San Angelo'. The Master also was probably in doubt as to what course he ought to take. If he did give a definite order, it may have been transmitted to the crew in the form of an inquiry as to what they intended to do when the stevedores returned or something of a similar nature. At any rate, he took no steps at that time to pay them off, and everyone seemed disposed to postpone the 'show down' until Monday. I do not think it essential to make a more definite finding as to this period, because it seems to me that what occurred on Monday settles the matter.

"On Monday, November 2, there was still sufficient steam in the boilers to operate the winches, and at eight o'clock there were again two gangs of stevedores at the pier head. There was also a much heavier picket line, this time including some men belonging to unions allied to those of the crew and engine room men. On Monday morning, two delegates representing the seamen and the engine room crew definitely informed the Master and the Chief Engineer that they could not furnish steam so long as there was a picket line in front of the ship. This action was taken by them, not as the result of any physical interference with unloading caused by the picket line or of any threats of violence, for there is no evidence of anything of that sort, but because of their own union sympathies and affiliations. They agreed to keep sufficient steam up for fire protection and refrigeration, but unequivocally refused to furnish steam for the unloading of the cargo.

"Faced with this point-blank refusal to unload the cargo, the Master decided to pay the men off. He told them that the Commissioner would come aboard Monday afternoon and called the men into the salon for the purpose of paying them off, and at that time, a dispute arose about the rider and nothing was done. But the Master directed the men to go to the Shipping Commissioner's office, Tuesday, at nine o'clock. This they did, and after some dispute and after again stating the reason given the Master for their refusal to assist in discharging the cargo, received their pay. They did not thereafter return to the ship except to get their belongings. No one could tell how long the labor disturbances at Philadelphia were going to last, and, it being apparent that the cargo could not be discharged as long as they did, the ship was laid up in Philadelphia.

"In view of the testimony I cannot accept the libellants' contention that the crew were standing by, ready and willing to help unload, and that the Master simply got tired of waiting for the stevedores to come on deck and paid off the crew.

"I find as a fact that the vessel laid up in Philadelphia for a reason for which the crew was responsible."

It should further be noted that at the time settlement was made and the appellants were paid their wages for the voyage, they signed the following release:

"Mutual Release.

"We, the undersigned, seamen on board the S. S. San Angelo on her late voyage from Seattle Wash. to Philadelphia, Pa. do hereby, each one for himself, by our signatures herewith given, in consideration of settlements made before the Shipping Commissioner at this port release the master and owners of said vessel from all claims for wages in respect of the said past voyage or engagement, and I, master of said vessel, do also release each of the seamen signing said release from all claims, in consideration of this release signed by them.

"Dated November 3d, 1936."

We have carefully considered the record and briefs in this case and think that the evidence clearly sustains the facts found by the learned trial judge in accordance with whose opinion we affirm the decree.

Since the appellants were at fault in causing the S. S. Angelo to be laid up in Philadelphia, under the clear and unambiguous wording of the articles of shipping, they are not entitled to recover.

The decree of the District Court is affirmed.